EPSTEIN BECKER & GREEN, P.C.
Anthony Argiropoulos, Esquire
Sheila Woolson, Esquire
150 College Road West
Suite 301
Princeton, NJ 08540
(609) 455-1540
*Attorneys for Plaintiff*
*Wakefern Food Corp.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WAKEFERN FOOD CORP.,<br><br>                    Plaintiff,<br><br>v.<br><br>CEDAR-SOUTH PHILADELPHIA I, LLC,<br>CEDAR QUARTERMASTER LLC, CEDAR<br>QUARTERMASTER II, LLC, CEDAR<br>QUARTERMASTER III, LLC<br><br>                    Defendant. | CIVIL ACTION NO.<br><br>**COMPLAINT** |

Plaintiff Wakefern Food Corp. ("Wakefern") by and though its undersigned counsel brings this lawsuit against Defendants Cedar-South Philadelphia I, LLC ("CSP") and Cedar Quartermaster LLC, Cedar Quartermaster II, LLC and Cedar Quartermaster III, LLC (collectively "CQM"), and asserts as follows:

**Preliminary Statement**

1.   CSP and CQM are affiliated companies that are owned by Cedar Realty Trust, which is a publicly held Real Estate Investment Trust.

2.   CSP is Wakefern's landlord at the South Philadelphia Shopping Center, which is located at 24th Street and Oregon Avenue in Philadelphia. The South Philadelphia Shopping Center is an older shopping center in need of repair and improvement.

3.   CQM owns the Quartermaster Plaza, which is directly across the street from the South Philadelphia Shopping Center on Oregon Avenue. Quartermaster Plaza is a newer shopping center.

4.   In a written lease modification agreement, Wakefern was promised that CSP would redevelop the old South Philadelphia Shopping Center, and that if the old South Philadelphia Shopping Center were not redeveloped, then Wakefern would have the right of first refusal for a new supermarket location across the street at the new Quartermaster Plaza. Thus, although redevelopment was preferred, the consolation for a failed redevelopment would be a brand new and appropriately sized and equipped grocery store across the street.

5.   However, CSP and CQM intentionally schemed to deprive Wakefern of its contract rights in order to pave the way for the sale of CSP and CQM's assets.

6.   **First**, CSP knowingly and intentionally refused and failed to (a) "diligently and continuously pursue" "the tenant consents and zoning, building and site plan approvals, permits or other similar entitlements" that CSP required "in order to be able to proceed with the Redevelopment" (collectively, the

"Landlord Required Permits and Approvals") and (b) use "commercially reasonable efforts to obtain the Landlord Required Permits and Approvals" for redevelopment.

7.   **Second**, CSP and CQM caused CQM to enter into a sham agreement with a non-party grocery store called Sprouts Farmers Market at Quartermaster Plaza in order to "trigger" Wakefern's right of first refusal. The agreement is a sham because among other things, the space proposed is not suitable for a Full Line Market such as a ShopRite, particularly due to the lack of loading lanes and bays, unsuitable parking, ingress and egress, and the terms are clearly not beneficial to Wakefern. CQM is trying to clear Wakefern's right of first refusal before selling the property, which is currently being marketed for sale.

8.   Wakefern seeks judgment that CSP has breached its agreements with Wakefern relating to the redevelopment, including the implied covenant of good faith and fair dealing, that CQM has tortiously interfered with Wakefern's agreements with CSP, in particular its right of first refusal. Further, Wakefern seeks a declaration that its right of first refusal has not been triggered.

**THE PARTIES**

9.   Plaintiff Wakefern Food Corp. ("Wakefern") is a New Jersey for-profit corporation with a principal place of business located at 5000 Riverside Drive, Keasbey, New Jersey 08832.

Wakefern is a retailer-owned cooperative, and its members own and operate supermarkets under the brands of ShopRite, Price Rite Marketplace, The Fresh Grocer, Dearborn Market, Gourmet Garage, and Fairway Market in Pennsylvania, New Jersey, New York, Connecticut, Maryland, Delaware, Massachusetts, New Hampshire and Rhode Island.

10. Wakefern is a citizen and resident of the state of New Jersey.

11. CSP and CQM are affiliated real estate investment companies that are part of Cedar Realty Trust (NYSE: CDR).

12. According to its website, "Cedar Realty Trust is a NYSE-listed real estate investment trust that owns a portfolio of predominantly grocery-anchored shopping centers in high-density urban markets from D.C. to Boston." See https://cedarrealtytrust.com/

13. CSP and CDR are Delaware limited liability companies headquartered in Port Washington, New York.

14. On information and belief, CSP's and CQM's members are citizens of Delaware and New York.

## JURISDICTION AND VENUE

15. The Court has diversity jurisdiction because the defendants are citizens of the states of Delaware and New York and Wakefern is a citizen of the State of New Jersey.

Additionally, the amount at issue in this case exceeds $75,000.000.

16.  Venue is proper because the events at issue in this lawsuit concern real property located in Philadelphia County, Pennsylvania.

### FACTS COMMON TO ALL COUNTS

17.  On or about September 11, 1997, Wakefern entered a lease with SPSP Corporation for real property located at 24th Street and Oregon Avenue in Philadelphia, Pennsylvania known as the South Philadelphia Shopping Center (the "Lease"). A true and accurate copy of the Lease is attached hereto as Exhibit A. The ShopRite of Oregon Ave. has operated at that location since that time, and the Lease expires and terminates on September 30, 2023.

18.  In or about 2014, CQM acquired a shopping center across the street from the South Philadelphia Shopping Center. That property is known as the Quartermaster Plaza, located at 2370 West Oregon Avenue, Philadelphia, Pennsylvania.

19.  Quartermaster Plaza is directly across the street from the South Philadelphia Shopping Center.

20.  According to Cedar Realty Trust's website,

> Quartermaster Plaza presents a large-scale, traditional big box shopping center experience at the heart of South Philadelphia. The development features a broad array of well-known retail brand

names, including PetSmart, Planet Fitness
and Home Depot. In addition, the area's only
BJ's Wholesale Club serves as an anchor.
Quartermaster is a valuable shopping and
dining resource to the South Philadelphia
region, and currently features 90,000 SF of
availability for tenant expansion options.

https://cedarrealtytrust.propertycapsule.com
/p/commercial-real-estate-
listings/Philadelphia-PA-
19145/Quartermasterplaza

21.   A true and accurate copy of the Quartermaster Plaza

site plan is attached as Exhibit B.

22.   In 2016, CSP acquired the South Philadelphia Shopping

Center from SPSP Corporation, and CSP assumed the Lease.

23.   According to Cedar Realty Trust's website,

The South Philadelphia shopping center
boasts 25 stores with a rich array of
national, regional and local retailers. A
high-performing Ross Dress for Less, an
impressive tenant mix and a well-trafficked
locale have established the center as a
highly convenient asset to the surrounding
Philadelphia region. With a ShopRite anchor,
owned by seasoned operator and community
champion Jeff Brown, the center connects the
community to a diverse number of retail
options, with specific focuses on beauty,
wellness, value-oriented shopping like the
Dollar Tree and much more. The center also
features numerous clothing stores, coffee
shops and other professional services.
Residents can take care of mailing needs,
drop off and pick up laundry, and take care
of shopping — all in one easy-to-reach
location.

https://cedarrealtytrust.propertycapsule.com
/p/commercial-real-estate-

listings/Philadelphia-PA-
19145/southphiladelphia

24.   CSP has not properly maintained the South Philadelphia Shopping Center. The South Philadelphia Shopping Center requires and has required significant repairs, upgrades, and improvements.

**CSP PROMISES TO REDEVELOP SOUTH PHILADELPHIA SHOPPING CENTER**

25.   On May 17, 2019, Wakefern and CSP entered a Third Lease Modification Agreement (the "Third Lease Modification"). A true and accurate copy of the Third Lease Modification is attached hereto as Exhibit C.

26.   The Third Lease Modification provided that (a) Landlord would redevelop the South Philadelphia Shopping Center; (b) Wakefern would acquire additional space of approximately 1,535 square feet; and (c) the Lease's termination date would extend for 10 additional years. Id.

27.   Wakefern would not have agreed to the Third Lease Modification but for CSP's promises and commitment to redevelop the South Philadelphia Shopping Center. Specifically, CSP covenanted and agreed to "**diligently and continuously pursue** the Landlord Required Permits and Approvals and shall use Landlord's **commercially reasonable efforts to obtain Landlord Required Permits and Approvals** …" Id. §3(e) (emphasis added).

28.   Given CSP's express commitment to the redevelopment, CSP requested and Wakefern agreed to material changes to the underlying Lease. These material changes were to Wakefern's detriment, and aimed at assisting CSP's good faith, diligent, continuous, and commercially reasonable efforts to redevelop the South Philadelphia Shopping Center.

29.   For instance, Wakefern agreed to allow (a) a 41,000 s.f. Target store on the premises; (b) a Ross Dress for Less clothing store to sell items normally sold in grocery stores; (c) an Ulta or Sephora beauty retailer to operate on the premises; and (d) a gym facility to sell health and beauty items normally sold in a grocery store. Wakefern also agreed to allow a sushi takeout and bakery.  Id. Sec. 8. And Wakefern agreed to extend the Lease term.

30.   Additionally, Wakefern agreed to allow a residential development. Id.

31.   Further, to induce Wakefern to agree to the Third Lease Modification, CSP covenanted on its behalf and on behalf of its affiliate, CQM, that no space at the adjacent Quartermaster Plaza would be leased to a full service supermarket.

32.   In pertinent part, Section 8(a) of the Third Lease Modification, entitled "Tenant's Adjacent Center Exclusive," provides:

> "as a material inducement to Tenant to enter
> this Amendment, Landlord covenants (and
> Landlord shall cause affiliates to covenant)
> to and for the benefit of the Tenant that
> subject to the terms hereof, no portion of
> the Adjacent Center [i.e. Quartermaster
> Plaza] shall be leased to, sold to, or
> otherwise occupied or operated by a tenant,
> owner, occupant, or user to carry on or
> operate a "Full Line Market" or "Prohibited
> Limited Class Markets" (collectively
> "Tenants Adjacent Center Exclusive")

Id.

33.   Critically, and as already noted in the Complaint, CSP expressly covenanted that it:

> Shall **diligently and continuously pursue** the
> Landlord Required Permits and Approvals and
> shall use Landlord's **commercially reasonable
> efforts to obtain** the Landlord Required
> Permits and Approvals **on or before the
> Outside Redevelopment Election Date**. The
> Landlord shall keep Tenant reasonably
> apprised of the status of obtaining the
> Landlord Required Permits and Approvals.

Id. §3(e) (emphasis added).

34.   The "Outside Redevelopment Election Date" was originally set for May 17, 2020. The Outside Redevelopment Date is the date by which CSP would advise Wakefern if the redevelopment would proceed or not.

35.   Pursuant to the Third Lease Modification, if CSP (as expressly covenanted) diligently and continuously pursued and obtained Landlord Required Permits and Approvals for redevelopment and the redevelopment was approved, then CSP would

advise Wakefern of CSP's election to proceed with redevelopment. Id. §3(f).

36. If CSP (as expressly covenanted) diligently and continuously pursued Landlord Required Permits and Approvals for redevelopment and the redevelopment was not approved, then CSP would advise Wakefern of CSP's election not to proceed with redevelopment. Id. §3(f). If the Landlord elected not to proceed with redevelopment, then landlord would issue a "Notice to Terminate." Id.

37. The Third Lease Modification expressly and unconditionally required CSP "to **diligently and continuously pursue**" all of Landlord Required Permits and Approvals and to use "**commercially reasonable efforts** to obtain [them.]" Therefore, the Third Lease Modification did not permit CSP unilaterally to abdicate its obligations to "pursue" redevelopment and elect not to proceed on or before the Outside Redevelopment Election Date. Nevertheless this is precisely what CSP did.

38. By the Third Lease Modification's terms, if the Landlord Required Permits and Approvals for redevelopment were not obtained despite CSP's diligent, continuous, and commercially reasonable efforts, then the Third Lease Modification would terminate, as would most of its provisions,

including the "Tenant's Adjacent Center Exclusive" related to Quartermaster Plaza.

39.   Upon the termination of the Third Lease Modification, the expiration of Wakefern's Lease term would revert back to September 30, 2023 and Wakefern would be granted a certain right of first refusal to lease supermarket space at the Quartermaster Plaza.

40.   The right of first refusal was not as beneficial to Wakefern as the redevelopment and exclusivity offered by the Third Lease Modification. For instance, the cost of building a new store in Quartermaster Plaza greatly exceeded the cost of renovating the ShopRite in the South Philadelphia Shopping Center as part of the promised redevelopment.

41.   However, the right of first refusal would only be effective if the Landlord Required Permits and Approvals for redevelopment were not obtained despite CSP's "diligent" and "continuous" pursuit and its "commercially reasonable efforts."

42.   The Third Lease Modification provides, in pertinent part, that:

> (b)   In the event that Landlord issues, or is deemed to have issued, a Notice to Terminate, then from and after the termination of this Amendment, Tenant shall have a right of first refusal (the "**ROFR**") to lease any space (the "**ROFR Space**") located in the Adjacent Center for use as a Full Line Market, if and as such space becomes vacant and available

for lease from time to time, on the
following terms and conditions:

(i). The term of the ROFR shall
begin on the date upon which this
Amendment is otherwise terminated
(the **"ROFR Commencement Date"**), and
shall expire concurrently with the
Lease, subject to earlier
termination in accordance with the
provisions of this paragraph 8(b)

<u>Id</u>. §8(b) ("ROFR").

## CSP REFUSES AND FAILS TO REDEVELOP
## THE SOUTH PHILADELPHIA SHOPPING CENTER

43. CSP did not honor its contractual obligation to
"diligently and continuously pursue the Landlord's Required
Permits and Approvals," and CSP refused and failed to "use
commercially reasonable efforts to obtain the Landlord Required
Permits and Approvals on or before the Outside Redevelopment
Election Date."

44. On March 3, 2020, Lars Kerstein, CSP's Vice President
of Development Leasing, represented to Wakefern that CSP had all
of the necessary tenant approvals for the redevelopment, but was
waiting the final zoning approval, which it would obtain once
Philadelphia lifted its COVID-19 moratorium on construction.

45. On March 30, 2020, Robin Zeigler, CSP's Executive Vice
President, advised Wakefern that CSP needed just one last
"rubber stamp" approval from the City of Philadelphia, which it
would obtain when Philadelphia's construction moratorium was

lifted. Ms. Zeigler reiterated and confirmed that CSP had obtained tenant consent.

46.  Again on or about April 3, 2020, Mr. Kerstein represented to Wakefern that CSP had all of the required tenant approvals, but still needed the one final "rubber stamp" approval from Philadelphia that it would get after the construction ban was lifted.

47.  On April 14, 2020, CSP represented that the "final approval" for which it was waiting was a "rubber stamp" approval from the Streets Department to build new vertical construction and that permit would be issued 4-6 weeks after Philadelphia lifted the construction ban.

48.  But when Philadelphia lifted virtually all of its restrictions on construction by May 1, 2020,[1] CSP did an about-face.

49.  Despite CSP's previous and unambiguous representations that it obtained all of the tenant approvals, on May 1, 2020, CSP claimed that it still needed approval from Rainbow—one of the smallest tenants at the Shopping Center. CSP had never previously mentioned a Rainbow consent to Wakefern; it had only referenced consent from Ross, which Mr. Kerstein said CSP had obtained.

---

[1]. See https://www.phila.gov/2020-05-01-restarting-construction-faqs/

50.   Consequently, CSP and Wakefern entered into a fourth lease modification on May 17, 2020, a true and accurate copy of which is attached hereto as Exhibit D ("Fourth Lease Modification"). Through this modification, the Outside Redevelopment Date was moved to September 20, 2020 with "time of the essence."

51.   CSP was keenly cognizant of its affirmative obligations to diligently and continuously pursue redevelopment through commercially reasonable efforts and that this covenant was the core of the parties' agreement. During the negotiation of the Fourth Lease Modification, CSP pressed for a provision that would allow it to unilaterally terminate the Third Lease Modification for reasons relating to COVID-19. Wakefern would not agree to this provision, however, and so such a provision was not part of or included in the Fourth Lease Modification.

52.   Thus, CSP's express covenant was unchanged. CSP's obligation remained that it:

> Shall **diligently and continuously pursue** the Landlord Required Permits and Approvals and shall use Landlord's **commercially reasonable efforts to obtain** the Landlord Required Permits and Approvals **on or before the Outside Redevelopment Election Date**. The Landlord shall keep Tenant reasonably apprised of the status of obtaining the Landlord Required Permits and Approvals.

Id. §3(e) (emphasis added).

53.  CSP's request to alter its obligations and give it an escape clause – i.e. COVID-19 - coincided with financial problems that CSP and CQM were apparently experiencing at the time. For instance, Cedar Realty Trust, which owns CSP and CQM, experienced a sharp decline in its stock price: from $18.74/share on February 17, 2020 to $4.83/share on May 18, 2020.

54.  Perhaps as a result of these financial challenges, CSP began looking for additional sources of financing for the redevelopment, including joint venture partners, including but not limited to Wakefern itself.

55.  In the meantime, according to CSP all that remained necessary for the redevelopment was one approval that CSP referred to as a "rubber stamp" and one tenant consent from one of the smallest tenants at the shopping center, which would also benefit from the redevelopment.

56.  In September 2020, CSP approached Wakefern about again extending the Outside Redevelopment Election Date.

57.  In response, Wakefern offered to consent to allow a Starbucks into the South Philadelphia Shopping Center and sought CSP's consent to record its exclusivity related to the Quartermaster Plaza.

58.  In response, CSP's Executive Vice President Ms. Zeigler admitted to Wakefern that giving Wakefern exclusivity at

the Quartermaster Plaza would be a "deal killer" for CSP's efforts to find financing.

59.   Wakefern already had exclusivity for the Quartermaster Plaza:  Wakefern simply sought to record it and make it a public record.

60.   Upon information and belief, by this point in time Quartermaster Plaza and the South Philadelphia Shopping Center were actively being marketed and/or offered for sale by CQM, CSP and/or Cedar Realty Trust.

61.   Upon information and belief, CQM, CSP and/or Cedar Realty Trust would be able to better market Quartermaster Plaza to potential purchasers without Wakefern's "Tenant Exclusive" because it would diminish the fair market value of Quartermaster Plaza.

62.   Upon information and belief, CQM, CSP and/or Cedar Realty Trust have failed to disclose the "Tenant Exclusive" to potential purchasers and instead have schemed to improperly extinguish Wakefern's exclusivity and Wakefern's ROFR.

63.   CSP and Wakefern entered into a fifth lease modification, dated as of September 16, 2020, which further extended the Outside Redevelopment Election Date to March 31, 2021 ("Fifth Lease Modification").  A true and accurate copy of the Fifth Lease Modification is attached hereto as Exhibit E.

64.   Despite CSP's uninterrupted, continuing, and express contractual obligation to **"diligently and continuously" pursue redevelopment with "commercially reasonable efforts"**, CSP took no further or meaningful action to advance the redevelopment at all.

65.   Instead, CSP knowingly and intentionally refused and failed to "diligently and continuously" pursue the Landlord Required Permits and Approvals for the redevelopment with "commercially reasonable efforts."

66.   CSP did so for the purpose of destroying Wakefern's "deal killing" exclusivity at Quartermaster Plaza so that that asset could more easily be sold given CQM, CSP, and Cedar Realty Trust's diminished economic status.

67.   Thus, and ultimately, CSP failed and refused to proceed with the redevelopment.

68.   Notwithstanding CSP's bad faith, Wakefern still held the benefit of its ROFR—until that too was targeted by CSP.

### CSP ATTEMPTS TO TRIGGER THE ROFR

69.   The Third Lease Modification sets forth Wakefern's ROFR in Section 8(b).

70.   Section 8(b)(ii) sets forth the requirements for CSP's ROFR notice.

71.   Section 8(b)(iii) provides that Wakefern must respond to the ROFR Notice within 90 days.

72.  On August 9, 2021, CSP sent Wakefern a letter that it claimed to be a ROFR Notice that CSP/CQM proposed leasing space in Quartermaster Plaza to Sprouts Farmers Market to operate a "Full Line Market." ("August 9 Letter").  A true and accurate copy of the August 9 Letter is attached hereto as Exhibit F.

73.  CSP's August 9 Letter failed to comply with the requirements of the ROFR provisions of the Third Lease Modification.

74.  For instance, Section 8(b)(ii)(B) of the Third Lease Modification sets forth very specific and detailed notice requirements if CQM/CSP were going to lease less than 60,000 square feet at Quartermaster Plaza. Those notice requirements are as follows:

(B)  If the ROFR Space contains fewer than 60,000 square feet of Gross Floor Area, then **the ROFR Notice shall specify** in reasonable detail:

(1)  a description of the space in the Adjacent Center containing at least 60,000 square feet of Gross Floor Area (the **"Adjacent Center 60,000+ Space"**) that Landlord proposes to lease to Tenant if Tenant exercises its ROFR under this paragraph;

(2)  the base rent and additional rent (each on a per square foot basis) for the ROFR Space proposed to be leased by the ROFR Triggering Tenant (the **"Offered PSF Rent Rates"**);

(3)  the base rent and additional rent (each on a per square foot basis) that Landlord proposes to charge Tenant for the Adjacent Center 60,000+ Space, which shall be equal to:

a)  60% of the Offered PSF Rent Rates, if the ROFR Space contains 20,000 or fewer square feet of Gross Floor Area; or

b)   80% of the Offered PSF Rent Rates, if the ROFR Space contains more than 20,000 and fewer than 60,000 square feet of Gross Floor Area;

1)   the amount of any allowance for construction of leasehold improvements and tenant finish rent (each on a per square foot basis) that Landlord proposes to provide Tenant for the Adjacent Center 60,000+ Space, which shall be equal to:

a).  60% of the allowance for construction of leasehold improvements and tenant finish (each on a per square foot basis) proposed to be given to the ROFR Triggering Tenant, if the ROFR Space contains 20,000 or fewer square feet of Gross Floor Area; or

b).  80% of the allowance for construction of leasehold improvements and tenant finish (each on a per square foot basis) proposed to be given to the ROFR Triggering Tenant, if the ROFR Space contains more than 20,000 and fewer than 60,000 square feet of Gross Floor Area;

(2).  the amount of any free rent or any other rent concessions rent (each on a per square foot basis) that Landlord proposes to provide Tenant for the Adjacent Center 60,000+ Space, which shall be equal to the free rent or any other rent concessions rent (each on a per square foot basis) proposed to be given to the ROFR Triggering Tenant; and

(3).  any other material terms and conditions on which Landlord proposes leasing the ROFR Space to the ROFR Triggering Tenant.

<u>See</u> Third Lease Modification, §8(b)(ii)(B), Exhibit C.

75.   The August 9 Letter did not comply with Section 8(b)(iii). For instance, the August 9 Letter did not contain any description, much less a "reasonably detailed description" of the Adjacent Center Space.

76.   On September 24, 2021 Wakefern advised CSP that the 90 day notice period had not been triggered because the August 9 Letter failed to comply with the requirements of the Third Lease Modification. A true and accurate copy of Wakefern's September 24, 2021 letter is attached as Exhibit G ("September 24 Letter").

77.   Wakefern's September 24 Letter confirmed that if CSP sent a proper ROFR Notice that contained the information required by the Third Lease Modification, Wakefern would consider it and respond within the 90 day period provided in Third Lease Modification Section 8(b).

78.   In Wakefern's September 24 Letter, Wakefern also requested that CSP provide it information regarding CSP's efforts to improve and redevelop the South Philadelphia Shopping Center.

79.   On September 28, 2021, CSP/CQM responded.  A true and accurate copy of this letter is attached hereto as Exhibit H. ("September 28 Letter").

80.   In their September 28 Letter CSP/CQM claimed that their August 9 Letter was a proper "ROFR Notice" even though the August 9 Letter clearly did not contain the required information, including detail related to the Adjacent Space. CSP/CQM then provided some information, still noncompliant with

the requirements of a proper ROFR Notice, including a site plan for the Quartermaster Plaza.

81.  CSP also claimed to be "surprised" that Wakefern was asking about its efforts to redevelop the South Philadelphia Shopping Center.

82.  CSP claimed that it had not obtained the Landlord Required Permits and Approvals and was not planning any redevelopment of the South Philadelphia Shopping Center.

83.  Incredibly, and contrary to the express terms of the Third Lease Modification, CSP claimed nothing "requires that Landlord shall have used commercially reasonable efforts to obtain the Landlord's Required Permits and Approvals (sic) as a condition of the Notice to Terminate or the delivery of the ROFR Notice." Id.

84.  In its September 28 Letter, CSP effectively admitted that it did not "diligently and continuously pursue the Required Permits and Authorizations" with "reasonable commercial diligence".

85.  On October 6, 2021, Wakefern responded.  A true and accurate copy of this letter is attached hereto as Exhibit I (the "October 6 Letter"). In the October 6 Letter, Wakefern expressed its interest in leasing the approximately 60,000 Adjacent Space identified in the September 28 Letter, but continued to have significant unanswered questions.

86.   Defendants' representatives refused to give Wakefern this basic information that it needed in order to evaluate the ROFR. These details are part of the "reasonable detail" that Defendants were required to provide Wakefern.

87.   CSP/CQM failed to provide all of the information required in the ROFR Notice—even reading the August 9 and September 28 Letters together. For instance, the Third Lease Modification required CSP to include in the ROFR Notice (a) the base rent and any additional rent proposed for the Adjacent Space; (b) the amount of any construction allowance for the Adjacent Space; (c) the amount of any free rent or rent concessions CSP/CQM is proposing for the Adjacent Space; and (d) "any other material terms and conditions on which Landlord proposes leasing the ROFR Space to the ROFR Triggering Tenant [Sprouts Farmers Market]." Defendants' ROFR Notice did not contain any of this required information.

88.   In its October 6 Letter, Wakefern again confirmed that until it received a ROFR Notice that complied with the Third Lease Modification, the 90 day notice period was not running and could not run.

89.   Wakefern also again confirmed that if CSP/CQM provided a ROFR Notice that complied with the Third Lease Modification, Wakefern would respond within 90 days.

90.    Finally, Wakefern noted that if the lease with Sprouts Farmers Market proceeded without providing Wakefern with the required ROFR Notice, Defendants would be in default under the Third Lease Modification and Lease.

91.    CSP/CQM responded formally as required by the Third Lease Modification on October 13, 2021 again indicating that it believed its ROFR Notice to be compliant with the Third Lease Modification, but finally provided Wakefern formally with additional information required under the ROFR Notice as set forth in the Third Lease Modification. A true and accurate copy of that letter is attached as Exhibit J ("October 13 Letter").

92.    Thus, and at minimum, the 90 day period in which Wakefern has to respond to the ROFR Notice could not have commenced earlier than October 14, 2021 even if the ROFR Notice had been issued in good faith, which it was not.

93.    The information contained in the purported ROFR Notices to Wakefern make clear that CSP/CQM is purporting to lease space to a competitor on terms that CSP/CQM knows make it economically impossible for Wakefern to exercise the ROFR.

94.    The purported transaction with Sprouts Farmers Market is a sham and bad faith transaction that was manufactured for the intended purposes of extinguishing Wakefern's contract rights.

95.   CSP/CQM's repeated and inadequate ROFR Notices evidence an intent to extinguish Wakefern's contract rights as soon as possible to clear the runway for a sale of Quartermaster Plaza.

96.   Indeed, CQM is now marketing Quartermaster Plaza separately from the South Philadelphia Shopping Center, where as a year earlier the properties were marketed together with the promise of a redeveloped ShopRite as the heart.

**COUNT I**

**BREACH OF CONTRACT**

97.   Wakefern repeats and incorporates the allegations in the preceding paragraphs as if set forth at length.

98.   CSP was required to comply with all of the provisions of the Lease and the Third Lease Modification.  This includes its obligation to "diligently and continuously pursue" and to "use diligence and commercially reasonable efforts to obtain the Landlord's Required Permits and Approvals."

99.   CSP failed to diligently, continuously or use reasonable commercial efforts pursue the Landlord Required Permits and Approvals.

100. In fact, it did the opposite.  Once it decided that the economics of the redevelopment had changed (primarily due to COVID), CSP stopped taking any action to obtain the Landlord Required Permits and Approvals.

101. Not only did CSP fail to get the "rubber stamp" approval from the Philadelphia Streets Department that it promised Wakefern it would obtain within six weeks after the COVID construction ban was lifted, it also failed to apply for, much less obtain, other Required Permits and Approvals including any building permits, which are required by the zoning permits.

102. CSP was also required to use diligence and commercially reasonable efforts to obtain the approvals of the tenants.  Despite telling Wakefern that it had all of the tenants' approvals or only needed the approval of a relatively small tenant—Rainbow, CSP now claims that it did not get all of the necessary tenant approvals.

103. However, in reality, CSP did not attempt to negotiate with Rainbow in order to secure its consent, even though Rainbow was in favor of the redevelopment.  Instead, CSP simply allowed that tenant approval to languish so it had an "out".

104. CSP's failure to diligently and continuously pursue the Landlord Required Permits and Approvals with commercially reasonable efforts breached the Third Lease Modification.

105. Instead of making efforts, CSP simply let the clock run out when the economics of the redevelopment became less attractive for it.

106. CSP also failed to keep Wakefern reasonably apprised of what was happening once CSP secured the Fifth Lease Modification.

107. CSP ignored its contractual obligations in order to deprive Wakefern of both the redevelopment and the exclusivity at Quartermaster Plaza so that Cedar could more easily market and sell Quartermaster Plaza.

108. Every contract imposes upon the parties to that contract a duty of good faith and fair dealing in the performance of that contract.

109. This means that a party to a contract must refrain from taking action or failing to take action that would destroy or injure the other party's ability to receive the fruits of the contract.

110. The law implies a promise to perform an act necessary to carry out the contract.

111. The Third Lease Modification imposed a duty of good faith on CSP.  That duty meant that CSP must take the actions necessary to fulfill the Third Lease Modification.

112. CSP breached the Third Lease Modification by intentionally failing to obtain the Landlord Required Permits and Authorizations so it could deny Wakefern the benefits of the Third Lease Modification, including Wakefern's exclusivity at

the Quartermaster Plaza and Wakefern's interest in redevelopment at South Philadelphia Shopping Center.

113. CSP compounded its breach of contract by purporting to lease space to a competitor in order to trigger the ROFR even though the terms are not appropriate for an anchor supermarket like a ShopRite.

114. CSP knows that the terms of the ROFR are not realistic, and on information and belief, it does not really expect to lease space to Sprouts on those terms. Rather, CSP is just attempting to trigger the ROFR to free the Quartermaster Plaza from any restrictions to make marketing it easier.

115. These actions breached the terms of the Lease and the Third Lease Modification.

116. Wakefern has fulfilled its obligation under the Lease and Third Lease Modification, including taking steps and incurring costs to prepare for its expansion.

117. As a result of CSP's breaches, Wakefern has suffered damages and is entitled to equitable relief.

118.  Wakefern has lost the benefit of the Third Lease Modification.

## COUNT II

### TORTIOUS INTERFERENCE

119. Wakefern repeats and incorporates the allegations in the preceding paragraphs as if set forth at length.

120. At all times, material to the facts pleaded in this Complaint, Wakefern had a reasonable expectation of the advantage and benefit afforded to it through the exclusivity related to the Quartermaster Plaza contained in the Third Lease Modification and the redevelopment of the South Philadelphia Shopping Center.

121. At all times material to the facts pleaded in this Complaint, CQM had actual knowledge and notice of Wakefern's foregoing reasonable expectation of advantage and benefit from that exclusivity and redevelopment.

122. CQM was also aware that Wakefern would have the benefit of the ROFR if the Third Lease Modification terminated.

123. CQM is unlawfully, unjustifiably and maliciously taking action to interfere with, divert, and destabilize Wakefern's actual and prospective expectations under the Third Lease Modification--the redevelopment of South Philadelphia Shopping Center and exclusivity and ROFR related to the Quartermaster Plaza.

124. As a direct result of CQM's malicious, unjustified and unlawful interference and tampering with the Third Lease Modification, CSP breached the Third Lease Modification and Wakefern's advantage in the redevelopment, exclusivity provision and ROFR as set forth in the Third Lease Modification has been destroyed.

125. Consequently, Wakefern has suffered and continues to suffer substantial damages.

## COUNT III

### DECLARATORY JUDGMENT

126. Wakefern repeats and incorporates the allegation in the preceding paragraphs as if set forth at length.

127. Pursuant to the Declaratory Judgment Act 28 U.S.C. §2201, the Court:

> may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

128. Thus, the Court may declare the parties' rights under the Lease and Third Lease Modification, including the ROFR.

129. For the reasons set forth in this Complaint, Wakefern seeks declaratory judgment from this Court that CSP/CQM's ROFR Notice is invalid and *void ab initio* because (a) CSP intentionally and in bad faith failed to abide by its obligations to diligently, continuously, and/or commercially reasonably redevelop the Philadelphia Shopping Center and/or (b) the subject transaction of CSP/CQM's ROFR notice is a sham.

130. Wakefern seeks a declaration that its ROFR was not triggered as a result of the Defendants' scheme and that their ROFR Notice is null and void.

WHEREFORE, Wakefern respectfully requests that the Court issue a judgment in its favor, together with damages, fees, costs, interest and all other relief deemed appropriate and just.

EPSTEIN BECKER & GREEN, P.C.

/s/ Sheila Woolson
Anthony Argiropoulos
Sheila Woolson
150 College Road West
Suite 301
Princeton, NJ 08540
(609) 455-1540
*Attorneys for Plaintiff*
*Wakefern Food Corp.*

Dated:  November 22, 2021

## CERTIFICATION

I hereby certify that this matter in controversy is not the subject of any other court, arbitration or administrative proceeding.

EPSTEIN BECKER & GREEN, P.C.

/s/ Sheila Woolson
Anthony Argiropoulos
Sheila Woolson
150 College Road West
Suite 301
Princeton, NJ 08540
(609) 455-1540
*Attorneys for Wakefern Food*
*Corp.*

Dated:  November 22, 2021